It is the Libertarian Party of Virginia v. Charles Judd. Mr. Getchell, pleased to hear from you, sir. May it please the Court, Duncan Getchell for defendants. I suppose we're obligated to begin with standing. And here we have a very unusual pleading decision because the Libertarian Party affirmatively pled that their interest and injury was hypothetical and contingent. They said that they had resident circulators and that if they became ill or otherwise unavailable, they were at hazard by not being able to use non-resident circulators. While Mr. Bowers, excuse me, while Mr. Bonner said that he had an interest in circulating for the Libertarian Party, he was pled as a paid circulator and, of course, therefore he wasn't going to circulate unless he was engaged. When we went to deposition, this fact pattern was affirmed. The Libertarian Party indicated that they did not currently plan to use out-of-state circulators. And then Mr. Bonner testified that he was physically unable to circulate in that election cycle. So under those circumstances, it would appear that there is no standing and therefore no jurisdiction because there is no immediate harm. The interest is merely hypothetical and contingent. About the fact that the Libertarian Party had to expend additional resources in order to comply with this statute, does that not imply a certain cost and injury that would denominate standing? I don't think there's anything in the record that they have any additional cost for complying with this statute in this cycle, in this election, which is what they were suing over. The fact that they may have had additional cost in the past doesn't allow them to establish a current harm in current standing. And I think their attempt— It sounds like taking that kind of a narrow view of the standing issue would never allow this case to come before a court. Oh, not at all. All they had to plead was that they wished to supplement their in-state circulators with out-of-state circulators. They very curiously pled the opposite. It's very easy to establish standing to attack this statute. It's just that for reasons that elude me, they pled themselves out of court on standing. And then at the very end, after the summary judgment motion was before the court, they tried to bring in somebody new that they wanted to circulate with, associate with, from the District of Columbia. But under Grace v. Family Dollar Stores, that's just a totally impermissible procedure. So I think that we have here a case that, under the precedence of this court and the U.S. Supreme Court, is just simply a non-starter. What about the fact that this Mr. Bonner had been doing this for 20 years and that he says, I think he says, that as soon as his condition improves, he wants to do it again? Well, I don't think he ever made a declaration that he intended to do it again in Virginia. I think he said he was a paid circulator for 20 years. I think he said he had now become a supervisor. So we don't know that he actually was going to come and do the work himself. But again, the standing question is whether or not there's immediate imminent threat of harm. And this is all too contingent and speculative. I'm perfectly prepared and happy to defend this statute on the merits, which I will do in a minute. But we are obligated to address the jurisdictional issue first. And I think that given the very curious posture of this case, we can't overlook that standing issue. Going to the merits. The witness residency report. Where's this Bonner fellow from? Now, that's interesting, too, because it does bear on the merits. Because he said he was from Philadelphia but was living in New York or vice versa. And he sometimes was in Belize doing movies. So he was somewhat peripatetic. And your statute says you've got to be from Virginia? The statute says you have to be a resident. The reason for that, of course, it's a requirement in a number of jurisdictions, is that we can't enforce our fraud laws. We can't get you. But I'll get to that in just a moment. But first I want to raise the standard of review. Because if, in fact, there's no severe burden on speech, then the state has a wide latitude in deciding what rules it wishes to administer with respect to ballot access. And the court, both in the Buckley case and in the Meyer case, indicated there's a sliding scale. It depends upon the severity of the burden on speech. Now, in Meyer's, they made a record that what the circulator wanted to do and did do was to engage the prospective signer on the issues, would basically proselytize, would ask the prospective signatory to agree, at least tentatively, with the merits of the referendum question that was being sought to be put on the ballot. Here, there's affirmative testimony. The only testimony as to how a minor party, like the Libertarian Party of Virginia, goes about requesting signatures is to absolutely run away from any merits discussion. Because what Mr. Bonner testified to, and he's the only person that testified how they go about doing this, was that he would approach someone and minimize the commitment. He would say, all I'm trying to do is to get this party on the ballot. This doesn't commit you to anything. It doesn't result in anybody calling you. You won't get a letter. Well, it seems to me that that's the opposite burden that was found in Meyer. It seems to me that it's not a very grave burden. Well, would you agree that circulating ballot decisions has protected core political speech? Not always. I think that the court— When would it not be? I'm sorry? When would it not be? I think you can read Myers and Buckley to say that if all you're doing is ballot access for a candidate, that that is a mechanical operation that may not trigger the same scrutiny as was triggered when you're arguing with someone to advance a particular policy issue on a referendum question. So I do think that the facts matter, and I don't think automatically you've got core political speech. But if you do, then would you agree that strict scrutiny applies? What the court oddly said in Buckley in responding to Justice Thomas' concurrence was that the burden, I mean the standard of review they were adopting was tantamount to strict scrutiny, so I'm not going to quibble that it would be strict scrutiny. So let's turn to strict scrutiny if that's the burden that I have. I'm entitled to have this requirement if it's narrowly tailored to a compelling state interest. And I don't think anybody questions that the interest asserted is compelling, which is the prevention of election fraud. So the only question is whether or not this is narrowly tailored to the prevention of fraud. But as in a lot of these cases across the country, there's no evidence in this record of any voter fraud, is there? Well, actually, there doesn't have to be record evidence of voting fraud when you're dealing with legislative facts. The General Assembly of Virginia is entitled to know that fraud can occur and has occurred in other jurisdictions. And we have cited a number of cases where fraud was pointed out by circulators. There's the Eighth Circuit case of Yeager, and there's the Montana case, Montanans for Justice. There's NRA Initiative petition. There was the affidavit of the Secretary of the State Board of Elections that talked about the fact that there has been election fraud in circulating. So I don't think it's a concern that is not within the province of the General Assembly. It may be, but how does that then lead you to the conclusion that it's a narrowly tailored statute to distinguish between potential fraudsters who are residents and those who are not? And I don't think we have to show that you're more likely to commit fraud if you're a non-resident. What we have shown is that if you do, I mean, you're no less likely to commit fraud, and if you do commit fraud, then you're inaccessible to us because we can't extradite to investigate. We would have to indict to extradite, and we wouldn't have the evidence necessarily or probably without having access through subpoena to the person. Furthermore, totally unaddressed in this case, is the fact that one of the... In your position, you can't issue a subpoena to somebody outside the state? You can't. As a matter of fact, it has been ruled a bar violation in Virginia to purport to issue a Virginia subpoena with extraterritorial effect because it's so obviously bogus. I used to practice law. We'd go get civil cases. We'd go to the other state and get a subpoena from another court and get the discovery just like we could get it within the state. There is a uniform act on civil discovery, but there's nothing on criminal, the ability of a state to go extraterritorially to try to enforce its criminal laws except for the extradition clause in the U.S. Constitution. But there's another interest. Well, you can indict people and extradite them, and you can get civil discovery in another state. Well, I don't think that the civil discovery statute is... You don't have discovery in a criminal case anyway. No, so I mean, I just... Normally, I mean, I've never heard of any, I mean, not normal discovery procedures. The prosecutor gets the information and turns it over. But in a civil proceeding, you can go to another state and take a deposition. If they are signatory to the uniform act, you could also trial letters robatory. But I just don't think any of that fits the category with the criminal investigation. You can't call them in front of the grand jury and question them in front of the grand jury if they're not here. And there's another interest. What about requiring, as the district court suggested, that they consent as a condition of being able to participate in this process through the state's subpoena power? I don't see how that changes anything. The fact that I have signed a piece of paper that says I consent to your jurisdiction doesn't then allow me to come get you and put you in front of the grand jury. Well, I would think it would facilitate any extradition request if the defendant, punitive defendant, had consented in advance to that very process. It may be cumbersome. It may be inefficient. But the question is whether or not this statute as presently drafted is narrowly tailored without that additional requirement. Something that falls between cumbersome and inconvenient and impossible, and I argue for the impossible end of that spectrum. How do we know that when you haven't tried it? Is not... I used to be a prosecutor. I always had a lot of luck just calling people up on the phone and saying, we need you down here to testify. And they'd show up. In other states? Yeah, they'd show up. I mean, they cooperate. Again, I think... A lot of people want to cooperate, particularly if you've got a consent agreement with them or a waiver, whatever you call it, whatever you call it here. This part of the thing was kind of... Your position on this kind of befuddled me a little bit. I never thought there was much trouble getting people to testify from outside, across the state line. It usually worked out. The Eighth Circuit, of course, has agreed with me, and so we have a... Well, they might. Maybe they didn't have any practical experience. I never had much trouble. I don't figure you did either. You've been a lawyer for a long time. Before I run out of time, let me talk about the other interest that wasn't discussed by the court below but is in the record, and that is you can't circulate if you're not of age, or you can't circulate if you're a felon. You can't circulate unless we identify that you're qualified, and our record capability does not extend to other states. We can find out if you're a resident, whether you're able to circulate, and we can prosecute you if you're not, but we're helpless if you're from out of state. And that would be our position on the narrowly tailored aspect. All right, sir. I do reserve a little time. Yeah, you reserve five minutes, sir. Yes, sir. Ms. Glinburn? Good morning, Your Honors, and may it please the Court. On the issue of standing, the appellant's position relies on a misreading of the complaint, and, frankly, ignoring certain paragraphs of the complaint. Here is the Libertarian Party of Virginia's allegation with respect to injury. The state residency requirement imposed by the statute reduces the pool of circulators available to support the LPBA's presidential candidate placing a severe burden on the candidates in the LPBA's First Amendment rights by making it more difficult for them to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for purposes of eliciting political change, to gain access to the ballot, and to utilize endorsement of a candidate which can be implicit in a solicitor's effort to gather signature on the candidate's behalf. The complaint never says that we only want to engage out-of-state solicitors if our current solicitors fall ill or are unavailable. We did allege that we are in a very insecure position because we have only these two in-state circulators that we can rely upon and that's certainly one reason why we would like to be able to include out-of-state circulators. But it simply isn't the case that we pled a contingent injury. The First Amendment injuries that we pled are injuries that exist as long as the statute is in effect. With respect to the standing of Darrell Bonner, again, Bonner alleges he would like to circulate petitions for the LPBA and its presidential candidate in Virginia but due to the residency requirement is unable to do so. He did not limit that allegation to the 2012 election. He says he would like to circulate petitions for a Libertarian Party candidate. But even if he did specify that he only meant the 2012 elections, this is the man's profession. He goes to as many states as he can to solicit petition signatures. He's done it for 20 years, as you pointed out, and there's simply no reason to believe that he wouldn't come and do that in Virginia if someone were willing to pay him to do it. So that's my response to the standing issue. As to the merits, although the Supreme Court hasn't decided whether residency requirement for petition circulators like this one is constitutional or not, it has given us some good guidance in the Buckley and the Meyer cases. We can derive three principles from those cases. First, circulating petitions on behalf of a candidate or a ballot initiative is core political speech. Second, laws that decrease the pool of available circulators severely burden First Amendment rights. And third, such laws are subject to strict scrutiny. With respect to the second prong, and that's the case in your view, even if at least to date, the Libertarian Party has not been prevented from successfully getting on a ballot. Absolutely, Your Honor, because the injuries that are discussed both in the Supreme Court cases and in the four out of five circuit court cases that have held these kinds of restrictions to be unconstitutional all talk about injuries to the First Amendment rights that are beyond mere access to the ballot. They talk about the interest in disseminating one's message through as many people, through the people that are chosen by the candidate and the party. Those interests are the ones that have been significant to the courts rather than simply access to the ballot. And in several of the circuit court cases, the courts have noted regardless of whether a candidate can get access to the ballot or an issue makes it on the ballot, all of these other interests are affected. So there is a severe burden, I would argue, almost as a matter of law, when you reduce the pool of eligible circulators because of the effect of diminishing the message and the candidate or party's ability to choose how that message is disseminated. Given that there is a severe burden the state has the burden of proof in showing that there is, the statute is narrowly tailored for compelling government interest and that less restrictive means are not effective. And the state simply has not offered any proof in this regard at all. What they offer is the affidavit of Don Palmer, the Secretary of the State Board of Elections, who states that he is aware of instances in which certain kinds of fraud have occurred, or he's aware of out-of-state petitioners or circulators who have been who haven't been able to be tracked down, but he gives no specific instances. These are just generalized, conclusory statements. They're not evidence of anything. Are you saying that the state of Virginia has to wait until an actual case of fraud arises before they can take action proactively, preemptively, to prevent it? I think that in a situation where almost half the states have no residency requirement like this, it is incumbent on them to show why they need one. And I think that of course they don't have to wait for the fraud to occur, but they have to give some reason to explain why they need this residency requirement that is beyond a mere rational basis. They have to provide something. They have a burden of proof. But even if they could show such a nexus, they need to prove that alternative means that are at least less restrictive are not adequate. And they haven't shown that either. Again, in the examples that they cull from some of the reported cases about petition fraud, there's no showing that states have tried alternative means such as requiring petition circulators to produce proof of identification and of residence in order to circulate petitions, requiring them to consent to jurisdiction, possibly criminalizing the failure to appear for an inquiry. None of those alternatives have been explored in the cases that they cite, and they give no proof that those would be inadequate. Is there any evidence in the record that it's more likely than not that out-of-state circulators will commit fraud? No, there is no such evidence, Your Honor. And in fact, one of the cases they cite, the In Re Initiative petition number 379, dealing with Oklahoma's episode of some pretty bad petition fraud involving out-of-state petitioners, when the Tenth Circuit looked at that evidence in considering a statute similar to this one, it was not impressed by those findings of fraud because, the Tenth Circuit said, nothing about those facts suggested that out-of-state circulators were more likely than in-state circulators to commit this kind of fraud. I think Mr. Gitchell doesn't really press that point. His main concern, and the Commonwealth's main concern, is that these alternatives are just impractical. I mean, it's a lot easier to put, pardon this colloquial term, the habeas gravis on a local resident as opposed to having to seek out somebody who commits a fraud and then flees the jurisdiction. That seems intuitively correct to me in terms of the practical applications. What's your response to that? My response to that is that there may be some additional administrative burdens to extending the right to free speech to people out-of-state. But such administrative or practical difficulties do not amount to a compelling government interest. If they are able to, if there are mechanisms by which they can track these people down, have them appear for inquiries, and prosecute them if necessary, then that alternative is what they need to do rather than restricting the free speech rights of people out-of-state and of candidates and parties. Or at least attempt, because it may be that in practice this turns out to be a completely infeasible method of enforcing the statute. And at that point, I suppose the Commonwealth could come back and say, look, we tried these, it doesn't work, and we need to make this distinction for better or worse. Yes, Your Honor, I suppose they could come back if they had evidence that the alternatives were impractical. And here we have no evidence. We have just assertions that this isn't going to work, it's too hard. And when we're dealing with strict scrutiny, it's not enough to say it would be hard and burdensome for us to ensure that everyone's free speech rights are protected. Could they bring a civil action for fraud when they're seeking an injunction against an out-of-state circulator? I don't see why not, Your Honor. I hadn't considered that. Another alternative, if we want to keep throwing them out, is some of these incidents of fraud that have been involved companies or corporations that hire out-of-state circulators. One could put some additional obligations on those companies and make them liable for that kind of misrepresentation. So there are a variety of alternatives that have not been explored, and there's no proof that they are not possible or so impractical as to make them nearly impossible. Thank you. I did want to address the Jaeger decision out of the Eighth Circuit, because that is the one circuit court case out of the five that have considered this issue that did uphold such a requirement. I think it's important to note about that case that the court there, I think, really misconstrued or maybe it wasn't pled, what the injury is in these cases. The court talked about the fact that it really has been easy for initiatives to get on the ballot in that state, but did not consider the more important First Amendment injury about limiting the pool of people who can disseminate a message and preventing parties and candidates from choosing the means in which they want to disseminate their message. And because they misunderstood, I think, the rights at issue, they did not apply strict scrutiny, and they did not consider the alternatives that were available. So I would submit that this court should follow the majority of other circuits and hold this residency requirement unconstitutional. I have some more time. If there are questions, I'd be happy to answer them, but otherwise I'll sit down. Thank you very much. Mr. Ketchel? I do want to make one correction. I said the district court didn't address the identity issue. That's what I should have said. With respect to standing, what was pled was, in paragraph 16, page 10 of the joint appendix, the Virginia residency requirement puts LPVA in a precarious position because it is only aware of two paid professional circulators who are both libertarians and residents of Virginia and who are consistently available. In past campaigns, these two people have been responsible for collecting a significant number of the required signatures. If either of them were to take ill or otherwise become unavailable, the LPVA would be unlikely to be able to collect the required 10,000 signatures. The LPVA intends to field presidential candidates in future races and expect to face similar constraints. Then that was explored at length in a designated party spokesman deposition and it was nailed down that they had no present intention to employ anybody from out of state. They were not ready, willing, and able to do so. With respect to Mr. Bonner, it became clear at his deposition that he wasn't able to do so and it was not explored what his intentions were in the future. It is completely speculative whether he would be a supervisor as opposed to an actual collector of signatures. Furthermore, finding a severe burden on his speech even if he wanted to participate is not obvious because he can collect the signatures. He just has to have somebody whose resident be the witness and that, it seems to me, permits the associational interest to be vindicated without a severe burden. Now, I do think that the elephant in the room is the fact that the Supreme Court of the United States has in clear dicta assumed that a voter eligibility residency requirement would be constitutional. In fact, Justice Ginsburg in footnote 16 in Buckley said that Chief Justice Rehnquist concern that states wouldn't be able to limit circulators to such people triggered the Judge Bork quote that lawyers and judges live on the slippery slope of analogy but they're not supposed to ski down to the bottom. So, the Supreme Court both in the majority opinion and in concurrences found at least four sitting justices to predict in dicta that this requirement is constitutional. Furthermore, the circuit split is deeper than acknowledged. It's not just the Eighth Circuit that's gone the other way. The Second Circuit in the Lerman case struck down a district residency requirement because the more narrowly tailored requirement would have been a state residency requirement. So, that's not even dicta, that's part of the analysis of the case. With respect to whether or not a legislature in choosing a narrowly tailored restriction has to produce evidence I think is not the way the Supreme Court or this court understands evidentiary facts, I mean legislative facts and legislative choices. The question is is it apparent enough that having some voluntary return to the jurisdiction is impractical enough so that this requirement should be deemed narrowly tailored. And I think that the General Assembly is entitled to have the judicial have its judgment entitled to some presumption of weight if it's rational and if it's not and it's not just rational because we don't have to make up a concern and a solution. This is a real concern and a real solution and the fact that non-residents aren't any more likely to commit fraud than residents doesn't really address our concern which is we need to be able to enforce our laws against fraud, we need to be able to review the qualifications of the circulators and we can't practically do it other than the way we've done it. Thank you very much Mr. Getchell. We're going to come down and reconcile.
judges: Robert B. King, Albert Diaz, Henry F. Floyd